RATTET PASTERNAK, LLP
*Attorneys for the Debtor*
550 Mamaroneck Avenue
Harrison, New York 10528
(914) 381-7400
Jonathan S. Pasternak, Esq.
Dawn Kirby Arnold, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:

|  |  |
|---|---|
|  | Chapter 11 |
| ANGELO & MAXIE'S LLC, | Case No. 11-11112 (SCC) |
| Debtor. |  |

------------------------------------------------------------------X

**APPLICATION FOR ORDER (I) PURSUANT TO §§105, 363 AND 1146 OF THE BANKRUPTCY CODE AND RULES 2002, 6004 AND 9006 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE SCHEDULING AN EXPEDITED HEARING AUTHORIZING A PRIVATE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS TO LANDRY'S SEAFOOD HOUSE – NORTH CAROLINA, INC. FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (II) APPROVING THE ASSET PURCHASE AGREEMENT IN CONNECTION THEREWITH; (III) PURSUANT TO §§105 AND 365 OF THE BANKRUPTCY CODE AND RULES 6006 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE DEBTOR'S NONRESIDENTIAL REAL PROPERTY LEASE USED IN CONNECTION WITH THE PURCHASED BUSINESS AND FIXING APPLICABLE CURE COSTS FOR SUCH LEASE AND (IV) GRANTING RELATED PRE-HEARING RELIEF**

TO:    **THE HONORABLE SHELLEY C. CHAPMAN,**
         **UNITED STATES BANKRUPTCY JUDGE:**

Angelo & Maxie's, LLC, the debtor and debtor-in-possession herein (the "Debtor"), by

its attorneys, Rattet Pasternak, LLP, files this motion (the "Motion") seeking entry of an order (i)

pursuant to §§105, 363 and 1146 of the Bankruptcy Code and Rules 2002, 6004 and 9006 of the

Federal Rules of Bankruptcy Procedure scheduling an expedited hearing authorizing the private

sale of substantially all of the Debtor's assets related to its restaurant business to Landry's

Seafood House – North Carolina, Inc. ("Purchaser") free and clear of any and all claims, liens, encumbrances and other interests; (ii) approving the Asset Purchase Agreement in connection therewith; (iii) pursuant to §§105 and 365 of the Bankruptcy Code and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure authorizing the assumption and assignment to Purchaser of the Debtor's nonresidential real property lease, as may be amended or restated ("Lease") including fixing applicable cure costs related thereto; and (iv) granting related pre-hearing relief. In support of this Motion, the Debtor respectfully represents:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(A).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This proceeding has been initiated pursuant to Bankruptcy Code §§ 105(a), and 363.

## BACKGROUND

4.      On March 14, 2011 (the "Filing Date"), the Debtor filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code.

5.      The Debtor has continued in possession of its business and management of its property pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6.      An official committee of unsecured creditors (the "Committee") has been recently formed by the United States Trustee, and the Committee has recently selected the law firm of Silverman Acampora LLP as its proposed counsel.  No trustee or examiner has been heretofore appointed in this proceeding.

7.      The Debtor owns and operates a popular white tablecloth steakhouse restaurant

known as Angelo & Maxie's located at 233 Park Avenue South at 19th Street, New York, New York. The current management has operated the restaurant for approximately six years. The Debtor employs between 100-200 employees at various times.

8.     The name Angelo & Maxie's comes from the hit tune "Lullaby of Broadway" from the musical 42nd Street.  In 1996, the restaurant underwent a $1.5 million renovation to create its current 1930's style Art Deco atmosphere.  The 230-seat restaurant serves over 700 dinners on weekend nights.  The restaurant serves high quality steaks, emphasizing friendly service and American abundance at moderate prices.  The average check at Angelo & Maxie's ranges from $35 to $40 per person.

9.     The Debtor experienced financial difficulty in the down economy over the past few years, which was exacerbated by the extremely poor weather this past winter.  The Debtor fell behind in its rent to its landlord, but the Debtor disputes the amount alleged due and disputes the validity of a notice to cure and notice of termination allegedly served by the Landlord prior to the Chapter 11 case.  The Debtor intended to use the Chapter 11 process to protect its valuable lease while determining what is due to the landlord, and curing the amount determined due.

10.     Unfortunately, since the commencement of the Chapter 11 case, the Debtor's cash flow has remained restricted and its working capital depleted. The Debtor is barely able to meet its administrative obligations and is concerned about its long term viability if it is not immediately able to find new capital or a strategic transaction.

11.     The Debtor has made exhaustive efforts since the Filing Date to obtain either (a) additional capital contribution from its members or (b) obtain debtor-in-possession financing. However, in light of (a) the substantial unsecured pre-petition loans already made by the Debtor's Class A members totaling in excess of $1,100,000 and (b) the pre-existing first priority

security interests and tax liens already asserted against all of the Debtor's assets, the Debtor has had no success in obtaining either additional capital contribution or commitments for debtor-in-possession financing to date.

12. Specifically, the Debtor's business has struggled since filing bankruptcy and faces serious challenges absent an immediate rescue package. Reduced cash flow and liquidity, restricted trade vendor terms (most of who have placed the Debtor on COD) have put strains on the Debtor's ability to operate under a cash collateral budget that, even if met, already projects losses.

13. These operational challenges have been exacerbated by several items. First, the restricted cash flow of the Debtor has been exacerbated by litigation with the Debtor's landlord over whether the Debtor's leasehold interest was terminated pre-petition. While the Debtor believes it still maintains its leasehold interest, the litigation has cast an air of uncertainty over the Chapter 11 case and the Debtor's long term viability and, if litigation continues in a protracted manner, could jeopardize the business.

14. Adding yet more difficulty to the operations, New York State Department of Taxation and Finance recently filed secured and priority claims against the Debtor's estate in an amount far more significant than originally expected.

15. Moreover, the landlord litigation and the imposition of a tax lien has jeopardized the Debtor's collateral and strained an already difficult relationship between the Debtor and its senior lender, Capital One. Absent an immediate rescue, the Debtor's business and estate may suffer irreparable harm.

16. In the past several weeks, the Debtor has diligently worked to find a solution to the near term liquidity shortage, its litigation with the landlord, and the substantial secured and

priority claims of the taxing authorities and its senior secured lender. The Purchaser has acted quickly to work with the Debtor to find solutions to each of these challenges. Specifically, and as outlined to the Court at the hearing held on April 13, 2011, to alleviate the strained relationship between the Debtor and Capital One, and given recent "aggressive" actions of Capital One, the Purchaser moved quickly to acquire the remaining Capital One loan position[1] and has agreed to a consensual use of cash collateral during the Chapter 11 case, giving the Debtor the breathing room it needs to stabilize its operations and quickly exit this case. With respect to the landlord litigation, which threatened the Debtor's ability to operate, the Purchaser has likewise provided a significant benefit to the estate by meeting with the landlord regarding the proposed transactions described herein. Based on those meetings and the reputation and financial strength of the Purchaser, the landlord has agreed to adjourn its relief from stay motion until the transaction can be completed. Simply said, the swift and immediate actions of the Purchaser have provided immeasurable benefits the estate and its creditors by ensuring the transactions described herein can be closed.

17.     Although the Debtor is currently operational, it is not generating sufficient revenues to maintain profitability, and has therefore made a reasonable business decision to maximize the value of its assets for creditors by seeking an immediate and expedited strategic transaction for the business operation and Lease, respectively.

---

[1] As further disclosed to the Court at the April 13th hearing, Jeffrey Lehmann, one of the Debtor's Class A members, satisfied $600,000 of the Capital One secured debt by virtue of Capital One's set off of his personal bank account. Mr. Lehmann has now asserted a right of subrogation to the extent of $600,000 of the Capital One pre-petition secured claim.

1275705-2

## RELIEF REQUESTED AND BASIS FOR RELIEF

### A.     The Management Agreement

18.     Given the restrictive cash flow position that the Debtor is presently faced with, the Debtor commenced negotiations with the Purchaser to formulate an exit transaction, which contemplates the immediate takeover of management by the Purchaser pending a sale of the Debtor's business to the Purchaser, as Purchaser has more than sufficient and adequate working capital and is therefore more suited to and capable of keeping the Debtor's business and restaurant viable pending closing on the contemplated sale.

19.     Purchaser is a national restaurant organization based in Houston, Texas with over 250 restaurants, 2 casinos, an amusement park and 2 aquariums generating combined annual sales in excess of $1 billion and has recently acquired Bubba Gump Shrimp Company in Times Square. Purchaser has vast experience managing restaurants throughout the country and in New York City. In addition, Purchaser has no previous connection, affiliation or interest in or with the Debtor or any of its insiders and is represented by separate counsel.

20.     Accordingly, a Management Agreement was negotiated between the Purchaser and the Debtor and approval of which was obtained pursuant to an order entered by the Court on April 26, 2011. The Management Agreement allows the Debtor's operations to continue through a sale closing date and provides that the Purchaser, as Purchaser, shall be permitted to use the assets of the Debtor and retain for its sole benefit all profits of the Debtor after paying all ordinary and necessary expenses of the Business, including but not limited to goods purchased, payroll, rent, taxes of any kind and insurance. Further, the Purchaser shall be responsible for all expenses incurred for operation of the Business that become due during its period of operation of the Debtor's business under the Management Agreement. The Management Agreement further

1275705-2

provides that as a condition to and in consideration of Purchaser's undertaking its obligations under the Management Agreement, Purchaser requires that the Debtor and the Committee agree to permit Purchaser to acquire substantially all of the Debtor's assets through a private sale transaction on an expedited basis pursuant to Bankruptcy Rule 6004(f)(1) and Bankruptcy Code Section 363.

21.     Accordingly, the Management Agreement specifically provides that that any claim incurred by virtue of the funds advanced by Purchaser for expenses incurred during the Term (as defined in the Management Agreement) shall be allowed as an administrative expense claim in the Debtor's Chapter 11 case pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code; provided that such claim(s) shall be deemed waived, in accordance with the terms of the Management Agreement, upon the closing of a sale to the Purchaser.

**B.      The Debtor's Exigent Need For Private Sale to Purchaser**

22.     The Debtor has projected operational losses during the first few months of the Chapter 11 case such that it projects aggregate losses over the first 2-3 months of the Chapter 11 case in excess of $175,000, which losses are to be funded/advanced by the Purchaser under the Management Agreement.

23.     In order to avoid the incurring of a significant administrative expense claim in favor of the Purchaser during any extended term under the Management Agreement, the Debtor and the Committee determined that it would be in the best interests of the Debtor's estate to try and curtail the projected losses and accumulation of administrative expenses associated therewith by moving forward with an expedited private sale to the Purchaser, which sale proceeds will form the basis and funding for a plan of liquidation in the Chapter 11 case that will result in a distribution to all of the Debtor's creditors.

24.     It is respectfully submitted that the Debtor has not only properly exercised its business judgment, but it has done so in a way which has already preserved the enterprise.  As explained below, while the Debtor's vendors and suppliers tighten the vice on the business by demanding COD terms (which is their right), the Debtor has sought to save the business and its many employee jobs (over 100).

25.     As explained by the Debtor in this Motion and in Court, the Debtor has already tested the marketplace by seeking not only other buyers and financiers but also by consulting with business brokers.  The Debtor has entered into no less than four non disclosure agreements with parties other than the Purchaser since the Filing Date and disseminated due diligence to those parties; however, no party other that the Purchaser has made an offer, informal or otherwise, to date. In addition, no other buyers or financiers have appeared despite the fact that it is well known throughout the New York City restaurant industry that the Debtor is in bankruptcy and in financial distress.  It is therefore submitted that, in light of the Debtor's exigent circumstances, there indeed has been sufficient marketing.

26.     There is likely a logical explanation that other buyers or financiers have not appeared: the Debtor is on the precipice of liquidation.  First, the Debtor and its landlord have been in a contentious dispute over whether the Debtor has any leasehold interest or whether the Lease terminated pre-petition.  Simply said, without the Lease, the Debtor has nothing to sell or reorganize. Second, the Debtor and its then senior secured lender Capital One began taking aggressive actions immediately after the Petition Date. Third, and perhaps most importantly, the Debtor does not believe it can pay its administrative expenses as they come due without the financial support and backstop provided by Purchaser under the Management Agreement.

27.     The Debtor's budget projects losses in excess of $178,000 through June 30, 2011.

There is no credit or working capital available to the Debtor and, in fact, most of the vendors, have refused to extend credit terms, thus forcing the Debtor to pay COD, which has had a severe impact on liquidity.

**C.**      <u>**Justification for Private Sale**</u>

28.      While many section 363 sales are conducted under competitive bidding procedures, there is no requirement in section 363 of the Bankruptcy Code to do so.

29.      In fact, Bankruptcy Rule 6004(f) specifically contemplates private sales with the statement that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction". Here, the Debtor and Creditors Committee support the private sale.

30.      Courts have noted that private sales are appropriate under section 363 in circumstances similar to the instant case. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("Unlike judicial sales under the Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to conduct public or private sales of estate property."); *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction").

31.      Accordingly, courts in this District have approved private sales of assets when they think the general standards for approval under section 363 of the Bankruptcy Code are satisfied. See, e.g., *In re Wellman, Inc.*, Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2009) (order approving the sales of one of the debtors' facilities' by private sale, not subject to higher and better offers); *In re Delta Air Lines, Inc.*, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y.

Nov. 29, 2005) (order authorizing the sale of certain aircraft by private sale and stating that "no auction was necessary with respect to sale of the [a]ircraft").

32.     Given (a) the substantial marketing of the Debtor's assets, (b) the lack of any other offer to date, (c) the significant cash purchase price being offered by the Purchaser, (d) the illiquidity and projected losses of the Debtor, (e) the immediate and swift action of the Purchaser to satisfy the demands of the Landlord and Capital One, the Debtor believes that the private sale is justified and the best way to maximize value and save jobs.  It is extremely unlikely that an overbid process will generate higher and better offers for the Debtor's assets. Moreover, because of the substantial carrying costs for the business that will be incurred once Purchaser ceases to pay these costs under the Management Agreement, conducting even an expedited overbid process would impose significant carrying costs on the Debtor's estate which the Debtor will have no ability to pay.

33.     In addition, the secured creditors, as the primary economic stakeholder in this transaction, have not indicated that they would pay the costs associated with a more extended sale or plan process. Nor does the Debtor have any other source to fund such an extended process. By contrast, selling the Debtor's assets by a private sale will allow the Debtor to collect proceeds in an amount sufficient to fund a plan while avoiding the possibility of significant unfunded administrative costs or operating losses being incurred.

34.     It is submitted that the Debtor and the Purchaser, in full consultation with the Committee, are proceeding in good faith and at arms length. The Purchaser is not an insider of the Debtor and the transaction was negotiated in good faith and only entered into after protracted negotiations.

35. The exigencies of this case dictate that a private sale be approved. Simply put, if the Debtor were forced to engage in an auction process, it would run out of funds to conduct operations, would not have the benefit of the Management Agreement, there would be no litigation standstill with the Landlord (resulting in full scale litigation over whether the Lease was terminated pre-petition), the estate would become administratively insolvent, and a serious risk of liquidation would be present.

35. For all of these reasons, the private sale of the Debtor's assets as requested herein should therefore be approved.

**D.      The Asset Purchase Agreement**

36. On April 26, 2011, the Debtor and the purchaser approved the form of the Asset Purchase Agreement ("Purchase Agreement") to be executed substantially in the form annexed hereto as **Exhibit "A".**

36. Pursuant to the Purchase Agreement, Purchaser shall acquire, and the Debtor shall convey by private sale, all of the right, title and interest that Debtor possesses as of the Closing in and to the Assets, as such term is defined in Section 1.1 of the Purchase Agreement, free and clear of all Liens (as such term is defined in the Purchase Agreement) and Liabilities (defined in Section 5.3.2) pursuant to Sections 363(b), (f), (k), (m) and 365 of the Bankruptcy Code and Rule 6004(f)(1) of the Federal Rules of Bankruptcy Procedure.

37. The sale and transfer of the Assets, as defined in and provided for under the Purchase Agreement, shall be deemed free and clear, subject to and except for the Assumed Liabilities (as defined under the Purchase Agreement) of all liens, claims, encumbrances, other interests, debts, causes of action, obligations, liabilities, and charges of any kind, nature or description whatsoever, whether fixed or contingent, legal or equitable, perfected or unperfected

(collectively, "Liabilities"). Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement, all persons and entities asserting Liabilities of any kind or nature whatsoever against or in Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated) arising under or out of, in connection with, or in any way relating to, Debtor, the Assets, the operation of the Debtor's business prior to the Closing Date (as defined in the Purchase Agreement), or the transfer of the Assets to Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting such Liabilities against Purchaser, its successors or assigns, its property, or the Assets; provided, however, that this paragraph shall not defeat any right which a party to an Acquired Contract or Assumed Liability (as defined in the Purchase Agreement). The sale is contingent only upon bankruptcy court approval in the Debtor's bankruptcy case and the Debtor's authorization and ability to assume and assign the Lease.

38.     In consideration of the sale of the Assets covered by the APA, the purchaser will pay the Purchase Price at closing, estimated as follows (parties should review the APA in detail as the below is a summary thereof):

Cancellation/Credit Bid of the Estimated Management Agreement Claim: $178,691[2]
(based on estimates from the Cash Collateral Budget through June 30, 2011)
Estimated Allowed Administrative Expenses including Professional Fees: $250,000
Estimated Lease Assumption/Cure:  $335,866.97
Assumption of Payment of Estimated Priority/Secured Tax Claims: $260,000
Estimated section 503(b)(9) Claims: $103,000
Credit Bid of Purchaser's Secured Claims: $1,194,310.76
Estimated Maximum Payment of Secured Claim of Lehmann: $497,000[3]
Unsecured Creditor Distribution Under a Plan: $160,000
TOTAL ESTIMATED PURCHASE PRICE: $2,978,868.73

---

[2] Based on estimates from the Cash Collateral Budget through June 30, 2011.

[3] Less a further dollar for dollar adjustment to the extent Allowed Administrative Expenses (including professional fees and allowed Bankruptcy Code section 503(b)(9) claims) exceed $353,000.

**E.**     **Debtor's Sale Pursuant to Bankruptcy Code §363(b) and (f) is Appropriate**

38.     Section 363(b) of the Bankruptcy Code provides, in pertinent part, that the Debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate". 11 U.S.C. §363(b)(1). Inasmuch as the Assets constitute the Debtors' on-going business and are substantially all of the Debtor's business assets, the proposed sale is out of the ordinary course of the Debtor's business.

39.     Section 363 does not set forth an express standard for determining whether a sale of property under §363(b) should be approved; however, courts that have interpreted this section consistently apply an "articulated business judgment" standard. *See, Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Walter*, 83 B.R. 14, 17 (Bankr. 9th Cir. 1988); *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

40.     The Court of Appeals for the Second Circuit first enunciated this standard by stating: "The rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him at the hearing *a good business reason* to grant such application." *Lionel*, 722 F.2d at 1070-71 (emphasis added).

41.     Section 363(b) does not require that the Court substitute its business judgment for that of the Debtor, *See, e.g., Ionosphere Clubs*, 100 B.R. at 676 (court will not substitute a hostile witness's business judgment for a debtor's, unless testimony "established that the [debtor] had failed to articulate a sound business justification for its chosen course"). Rather, the Court should ascertain whether a debtor has articulated a valid business justification for the proposed

transaction. This is consistent with "the broad authority to operate the business of the Debtor . . . [which] indicates congressional intent to limit Court involvement in business decisions by a Trustee . . . [so that] a Court may not interfere with a reasonable business decision made in good faith by a Trustee". *In re Airlift Int'l, Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982).

42.     Other courts have approved the sale of a debtor's assets under §363(b)(1) of the Bankruptcy Code when (i) the sale is supported by the sound business judgment of the debtor's management; (ii) interested parties are provided with adequate and reasonable notice; (iii) the sale price is fair and reasonable; and (iv) the purchaser has acted in good faith. *See, e.g., In re Betty Owens Schools, Inc.*, WL 188127 at *4 (S.D.N.Y. 1997) (setting forth the foregoing four elements in connection with the 363(b)(1) inquiry and citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re General Bearing Corp.*, 136 B.R. 361, 365-66 (Bankr. S.D.N.Y. 1992) (suggesting that the salient factors under *Lionel* are the foregoing elements). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Ames Dept. Stores, Inc.*, 136 BR 357, 359 (Bankr. S.D.N.Y. 1992); *In re Integrated Resources, Inc.*, 147 B.R. at 656-57 (S.D.N.Y. 1992) (a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate). The Debtor has determined that the maximization of the return to creditors can best be accomplished through the proposed asset sale upon the terms contained in the Purchase Agreement and that the transaction is in the best interests of its estate and creditors and should be approved by the Court.

43.     In determining whether a "sound business purpose" exists with respect to a sale of

assets prior to confirmation of a plan, Courts have looked at such factors as: the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and most importantly perhaps, whether the asset is increasing or decreasing in value. *Lionel*, 722 F.2d at 1071.

44.     In the Debtor's business judgment, the relief sought will maximize the Debtor's' recovery on its assets and is therefore in the best interests of its estate and creditors. Specifically, the soundness of the Debtor's decision is supported by the fact that the Debtor has not operated profitably in the chapter 11 case to date and is anticipated to operate at a significant cumulative loss going forward. As will be demonstrated at the hearing on this sale, absent an immediate infusion of cash, the Debtors will not be able to adequately sustain their operations. Consequently, without approval of the sale, the Debtor will be facing an immediate liquidation.

45.     If the Debtor was immediately liquidated, the Debtor will lose all of the going concern value of its assets. As a result, the Debtors believe that if the proposed sale is not approved, the recovery by the estate would be substantially, if not completely, reduced.

46.     An immediate sale of The Debtor's assets is the only viable option that will allow for any recovery to creditors on the remaining assets. Any additional delay will leave the Debtor with assets that will have no or little value compared to the values obtainable as a going concern. Time is therefore of the essence with respect to approval of the proposed sale.

**F.      The Debtor Has Exercised Sound Business Judgment**

47. The Debtor believes that the sale to the Purchaser represents a prudent and proper exercise of its business judgment and is supported by articulated business reasons because, absent such a sale, the Debtor would likely be forced to liquidate, resulting in no distribution to unsecured creditors, the loss of jobs of the Debtor's employees (over 100) and the loss of going concern value discussed above. With the sale to Purchaser, the Debtor is maximizing the value of its assets, preserving jobs and generating proceeds for distribution to its creditor constituents. *See, NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984) (the "fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources"); *In re Chateaugay Corp.*, 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997) ("public policy, as evidenced by Chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and concomitant preservation of jobs and going concern values"). Without the sale, the Debtor has no exit scenario other than liquidation, leaving creditors with far less than the amounts they are likely to receive from the proposed sale of the Assets as a going concern.

**G.      The Sale Price is Fair and Reasonable**

48.      The sale to Purchaser represents the highest and best price for the Assets secured by the Debtor to date. Consequently, in the Debtor's view, the Purchase Price represents substantial value to the Debtor's estate and provides favorable terms for disposition of the assets as a going concern in exchange for fair and reasonable consideration. *See, Mellon Bank N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1992); *See, also, Mellon Bank N.A. v. Official Comm. Of Unsecured Creditors*, 92 F.3d 139 (3d) Cir. 1996). Moreover, the Debtor's

and Creditor's Committee respective arm's length negotiations with the Purchaser ensured that the ultimate purchase price secured for the Assets is fair and reasonable under the circumstances.

## H. The Sale Terms Were Negotiated In Good Faith

49.     As set forth above, the Purchase Agreement s the product of good faith, arm's length negotiations between unrelated parties. Consequently, the Debtor requests that this Court find that these negotiations were in good faith and that the Purchaser is a "good faith purchaser" under §363(m) of the Bankruptcy Code.

## I. Asset Sale Free and Clear of Encumbrances

50.   In addition to seeking approval of a private sale outside of the ordinary course fo business, the Debtor seeks approval to sell its assets as a going concern, free and clear of any and all liens, claims or encumbrances in accordance with §363(f) of the Bankruptcy Code. A debtor-in-possession may sell property to §§363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions are satisfied:

(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. §363(f).

17

51.     The Purchase Price will result in sufficient proceeds to, inter alia, satisfy all secured claims, to the extent allowed, in full. The Debtor is are unaware of any secured claims except for (a) the secured claims of Purchaser as assignee of Capital One, who has consented to the proposed sale and will as part of the Purchase Price either credit bid and/or assume their entire secured claim, (b) Jeffrey Lehmann, who asserted a secured claim in the maximum allowable amount of $600,000, which claim will be paid in full, less a dollar for dollar adjustment to the extent Allowed Administrative Expenses (including professional fees and allowed Bankruptcy Code section 503(b)(9) claims which exceed $250,000, which excess claims shall be paid from the aforementioned $600,000), to the extent allowed and subject to the rights of the Debtor as trustee pursuant to Section 506(c) of the Bankruptcy Code, and (c) the secured claims of New York State Department of Taxation and Finance, which secured claims will be assumed in full by the Purchaser under the Purchase Price. Thus, the Assets can be sold free and clear of the secured claims and/or liens of the Purchase and Lehmann, respectively.

**J.     Assumption and Assignment of the Debtor's Nonresidential Real Property Lease**

52.     In connection with and ancillary to the Debtor's request for approval of the Purchase Agreement, the Debtor seeks authority to assume and assign one unexpired Lease, its non residential real property lease dated November 30, 2004 between the Debtor as tenant and 225 Fourth, LLC as landlord covering the Debtor's demised restaurant premises located at 233 Park Avenue South, New York, New York, such Lease to be amended and modified pursuant to further agreement between the Landlord and the Purchaser. The Landlord shall receive, from the Purchase Price, the allowed cure amount of $335,866.97[4] in full and final satisfaction of any and all pre-petition claims arising under the Lease, and the Lease shall be deemed in full force and effect and free of any defaults or purported termination thereunder.

---

[4] The Landlord is in agreement with the cure figure.

53.     Pursuant to §365(a) of the Bankruptcy Code, a debtor may assume or reject any executory contract, subject to the approval of the Bankruptcy Court. 11 U.S.C. §365(a). Once a contract is assumed, the debtor may assign such contract to a third party. 11 U.S.C. §365(f).

54.     Although §365(a) of the Bankruptcy Code does not provide a standard for determining when it is appropriate for a court to approve a debtor's assumption or rejection of an executory contract or an unexpired lease, courts have uniformly deferred to the business judgment of the debtor. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("A bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its "business judgment" to determine whether it would be beneficial or burdensome to the estate to assume it."); *see, also, In re Minges*, 602 F.2d 38, 43 (2d Cir. 1979); *In re G. Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994), *aff'd,* 187 B.R. 111 (S.D.N.Y. 1995) ("Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment [to assume or reject an executory contract] will not be altered.")

55.     Here, the assumption and assignment of the Lease as set forth in the Purchase Agreement is a necessary component of the sale transaction. The assumption and assignment of the Lease will allow the Debtor to maximize the recovery for the Debtor's estate and, as such, represents the sound exercise of the Debtor's business judgment.

## REQUEST FOR PRE-HEARING APPROVAL OF TERMINATION FEE

56.     The Purchase Agreement provides that in the event that the Purchase Agreement is not approved, or that the Debtor enters into an alternative transaction, that Purchaser shall be entitled to a termination fee in the amount of $145,000 (the "Termination Fee"), which, if unpaid

by the Debtor, shall constitute an allowed administrative expense claim under Sections 503(b) and 507(a)(2) of the Bankruptcy Code. The Termination Fee represents approximately 4.87% of the Purchase Price

57.     Is has become an established practice in chapter 11 cases to approve break-up Fees, expense reimbursements and other forms of protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code. See, e.g., Integrated Resources, 147 B.R. at 662; In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989). Such fees enhance the bidding process by inducing a "white knight" to submit a bid by providing compensation for the risks it is undertaking and to cover the costs of due diligence. 995 Fifth Ave. Assoc., 96 B.R. at 28.

58.     Generally, Courts approve such fees unless they are unreasonable. Integrated Resources, 147 B.R. at 662. When examining whether break-up or, in the case at bar, termination, fees are reasonable and appropriate, courts examine, inter alia, (1) the relationship between the parties negotiating the fee for any self-dealing or taint; and (2) whether the amount of the fee is unreasonable as compared to the purchase price. Id.

59.     The Termination Fee (as defined in the Purchase Agreement) in this instance is appropriate because (1) the Debtor and the Purchaser negotiated at arms length, (2) the Termination Fee provided an incentive for the Purchaser to enter into the Purchase Agreement and invest significant monies and efforts including, inter alia, negotiating the Management Agreement, the Purchase Agreement and conducting its due diligence, all while not knowing whether it will be the approved purchaser, and (3) the amount of the Termination Fee in the event the Purchaser is not permitted to purchase the Assets is reasonable in relation to the Purchase Price. Moreover, the Termination Fee is in the same order of magnitude as fees

approved in other cases. See, e.g., Financial News, 98 F.2d at 167 ($8.2 million, or 5.5% break up fee approved on a $149.3 million sale); LTV Aerospace and Defense Co. v. Thomson-CSF, S.A. (In re Chateaugay Corp.), 198 B.R. 848, 861 (Bankr. S.D.N.Y. 1996)($20 million, or 4.4% break-up fee allowed on $450 million offer); Integrated Resources, 147 B.R. at 662 (3.2% break up fee).

60.     Accordingly, it is submitted that the Termination Fee is both reasonable and necessary as an inducement for the Purchaser to go forward with the sale transaction contemplated herein, and the Debtor requests that the Court approve the Termination Fee in connection with entry of an order scheduling a hearing to approve the sale on an expedited basis.

## WAIVER OF STAY PERIODS

61.     To preserve the value of the Debtor's estate and expedite the closing of the transactions contemplated by the Purchase Agreement prior to the Debtor's assets losing substantially all of their value as described above, it is important that the Debtor be allowed to close the transactions contemplated by the Purchase Agreement as soon as possible after all closing conditions have been met or waived. The entire rationale for the sale is premised upon making the proceeds immediately available to the estate. The parties contemplate closing the sale on the business day after the entry of the Approval Order. Accordingly, the Debtor hereby requests that the Court waive the ten (10) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

62.     The Debtor have proposed serving the Order scheduling the expedited hearing

and the application and Exhibits by overnight delivery upon (a) counsel for Lehmann, (b) the Official Committee of Unsecured Creditors, through its counsel, Silverman Acampora, (c) all parties which have filed notices of appearance, (d) counsel to the Landlord, (e) all taxing authorities, (f) the Office of the United States Trustee, and (g) all of the Debtor's creditors.

63.    The Debtor respectfully submits that such notice is good and sufficient under the circumstances, and satisfies the requirements of Bankruptcy Rules 2002, 6004, and 6006.

64.    A proposed sale approval order is annexed hereto as Exhibit "B".

## <u>CONCLUSION</u>

65.    The Debtor submits that a private sale of the Assets on an expedited basis pursuant to the Purchase Agreement is a sound and prudent exercise of its business judgment. The sale to Purchaser will maximize the value of the Debtor and result in a distribution to all creditors. In addition, over 100 jobs will be preserved.

65.    Accordingly, the Debtor respectfully requests that (i) the Purchase Agreement be approved, (ii) the Termination Fee be pre-approved in connection with entry of the proposed scheduling order, (iii) the sale of the Assets to Purchaser free and clear of all claims, liens, interests and encumbrances be authorized, and (iv) the assumption and assignment of the Lease in connection with the Purchase Agreement be approved.

**WHEREFORE**, the Debtor seeks the entry of an order (i) pursuant to §§363(b) and (f) of the Bankruptcy Code and Bankruptcy Rule 6004, authorizing the Debtor to sell the Assets as defined in the Purchase Agreement free and clear of any and all claims, liens, encumbrances and other interests thereon, (ii) pursuant to §365(a) of the Bankruptcy Code, authorizing the Debtor to assume and assign the Lease to Purchaser and (iii) granting the Debtor such other and further relief as the Court deems just and proper.

Dated:  Harrison, New York
        April 26, 2011

> RATTET PASTERNAK, LLP
> *Attorneys for the Debtor*
> 550 Mamaroneck Avenue
> Harrison, New York 10528
> (914) 381-7400
>
> By: */s/ Jonathan S. Pasternak*
>     Jonathan S. Pasternak